THE STATE OF OHIO, APPELLEE, *v.* COFFMAN, APPELLANT.

[Cite as *State v. Coffman* (2001), 91 Ohio St.3d 125.]

(Nos. 00–330 and 00–355—Submitted November
28, 2000—Decided March 7, 2001.)

FRANCIS E. SWEENEY, SR., J. On October 21, 1997, the Delaware County Court of Common Pleas sentenced appellant, Dana E. Coffman, to a term of three to fifteen years for a robbery committed by appellant on April 6, 1996. On July 20, 1999, appellant moved the trial court for shock probation pursuant to former R.C. 2947.061(B).[1] The trial court denied appellant's motion.

Appellant appealed the trial court's decision to the Fifth District Court of Appeals. The court of appeals dismissed the appeal on the ground that a trial court's denial of a motion for shock probation is not a final appealable order. Appellant then moved the court of appeals to certify a conflict. On February 14, 2000, the court of appeals granted appellant's motion, certifying that its decision is in conflict with that of the Eighth Appellate District in *State v. Delaney* (1983),

---

1. At the time of appellant's offense, R.C. 2947.061(B) provided:

"Subject to sections 2951.02 to 2951.09 of the Revised Code and notwithstanding the expiration of the term of court during which the defendant was sentenced, the trial court, upon the motion of the defendant, may suspend the further execution of the defendant's sentence and place the defendant on probation upon the terms that, consistent with all required conditions of probation prescribed by division (C) of section 2951.02 of the Revised Code, the court determines, if the defendant was sentenced for an aggravated felony of the first, second, or third degree, is not serving a term of actual incarceration, is confined in a state correctional institution, and files the motion at any time after serving six months in the custody of the department of rehabilitation and correction." 146 Ohio Laws, Part I, 116–117.

9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462, the Second Appellate District in *State v. Brandon* (1993), 86 Ohio App.3d 671, 621 N.E.2d 776, the Fourth Appellate District in *State v. Riggs* (Oct. 4, 1993), Meigs App. Nos. 503 and 506, unreported, 1993 WL 405491, and the First Appellate District in *State v. Bauer* (Apr. 15, 1987), Hamilton App. No. C–860357, unreported, 1987 WL 9740.

The cause is now before this court upon our determination that a conflict exists (case No. 00–355) and upon our allowance of a discretionary appeal (case No. 00–330).

The court of appeals certified two related questions for our review and resolution. First, we are asked to decide whether the denial of a motion for shock probation pursuant to former R.C. 2947.061(B), 146 Ohio Laws, Part I, 116–117, can ever be a final appealable order. We are then asked to decide whether the denial of such a motion is a final appealable order only if the denial constitutes a constitutional or statutory violation. For the reasons that follow, we hold that a trial court's denial of a motion for shock probation is never a final appealable order.

The General Assembly repealed R.C. 2947.061—the shock probation statute— in Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7809. However, because the provisions of Am.Sub.S.B. No. 2 apply only to offenses committed after July 1, 1996, former R.C. 2947.061 is available to those who, like appellant, committed their crimes prior to this date. *Id.* at 7810, Section 5.

Whether the denial of a motion for shock probation is a final appealable order is a question that has sharply divided the courts of appeals. Even among those courts of appeals that have held that the denial of such a motion is reviewable, the courts are divided over the extent of their appellate power. Some courts of appeals hold that a review can occur only when the trial court's denial constitutes a constitutional or statutory violation. See *Bauer,* 1987 WL 9740, and *Delaney,* 9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462, *supra.* Other courts hold that their appellate power is not limited to orders involving a constitutional or statutory violation. See *Brandon,* 86 Ohio App.3d 671, 621 N.E.2d 776, and *Riggs,* 1993 WL 405491, *supra.* Still other courts reject both viewpoints and hold that denials of motions for shock probation are never, under any circumstance, reviewable. See *State v. Poffenbaugh* (1968), 14 Ohio App.2d 59, 67, 43 O.O.2d 191, 196, 237 N.E.2d 147, 153; *State v. Coffman* (Dec. 29, 1999), Delaware App. No. 99CAA09044, unreported, 2000 WL 1406 (the instant case).

The Ohio Constitution confers upon appellate courts "such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals." Section 3(B)(2), Article IV, Ohio Constitution. R.C. 2505.02 sets forth those orders that are "final orders" subject to review by Ohio's appellate courts. Appellant contends that the

denial of a motion for shock probation falls under R.C. 2505.02(B)(2), which defines as a "final order" any order that "affects a substantial right made in a special proceeding."

Appellant correctly observes that the determination of a shock probation motion is a "special proceeding" inasmuch as shock probation was a purely statutory creation and was unavailable at common law. R.C. 2505.02(A)(2); see, also, *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 63, 616 N.E.2d 181, 183; *State v. Jones* (1987), 40 Ohio App.3d 123, 124, 532 N.E.2d 153, 154. However, we disagree with appellant's contention that the denial of a motion for shock probation affects a "substantial right."

R.C. 2505.02(A)(1) defines a substantial right as "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect." A substantial right is, in effect, a legal right that is enforced and protected by law. *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 526, 709 N.E.2d 1148, 1150.

Former R.C. 2947.061(B) did not create a legal right to shock probation. Instead, the statute committed decisions regarding shock probation to the plenary discretion of the trial court that imposed the sentence. R.C. 2947.061(C) provided that "[t]he authority granted by this section shall be exercised by the judge who imposed the sentence for which the suspension is being considered." 146 Ohio Laws, Part I, 117. In deciding whether to grant or deny a motion for shock probation, this judge was given considerable discretion. R.C. 2947.061(B)'s terms were permissive in nature. R.C. 2947.061(B) provided, for example, that a trial court "may," upon the defendant's motion, suspend further execution of the sentence. *Id.* R.C. 2947.061(B) also permitted the trial court to impose its own terms upon the granting of shock probation and required only that the terms imposed by the trial court include the required conditions of probation prescribed by R.C. 2951.02(C). *Id.*

In matters of probation and parole, we have steadfastly refused to recognize a right of appeal absent a clear directive from the General Assembly that an appeal may be prosecuted. Our decision in *In re Varner* (1957), 166 Ohio St. 340, 2 O.O.2d 249, 142 N.E.2d 846, is instructive. In *Varner,* we reviewed a decision of the Pardon and Parole Commission, which found that the appellant in that case was a parole violator and which ordered that he be returned to prison. We were asked to decide whether this decision could be reviewed in a subsequent habeas corpus proceeding. The relevant statute in *Varner* was former R.C. 2965.21.[2]

---

2. As cited in *Varner,* R.C. 2965.21 provided:

"[A] prisoner who has been paroled, who in the judgment of the pardon and parole commission has violated the conditions of his * * * parole shall be declared a violator. * * * [T]he commission

We noted that this statute provided no apparent limitation on the authority and power of the Pardon and Parole Commission to declare a parolee a parole violator and to return him or her to prison. *Id.* at 346, 2 O.O.2d at 253, 142 N.E.2d at 850. Furthermore, the statute made no provision for appellate review. *Id.* at 347, 2 O.O.2d at 253, 142 N.E.2d at 851. Accordingly, we held that the Pardon and Parole Commission's decision to revoke appellant's parole and return him to prison was not reviewable. *Id.* at syllabus. In so holding, we concluded that under the law as it then existed, " 'the safeguard for the prisoner [was] in the conscientious, fairminded and humane viewpoint' " of the commission. *Id.* at 347, 2 O.O.2d at 253, 142 N.E.2d at 851, quoting *Ex Parte Tischler* (1933), 127 Ohio St. 404, 411, 188 N.E. 730, 732.

Like the statute at issue in *Varner*, R.C. 2947.061(B) conferred substantial discretion while simultaneously making no provision for appellate review. In the absence of such an express provision, we can only conclude that a trial court's order denying shock probation pursuant to former R.C. 2947.061(B) is not a final appealable order.

Former R.C. 2947.061's scheme, including the absence of appellate review, was consistent with the fundamental principles underlying the concept of probation. Shock probation provided defendants with an opportunity to receive probation after they had spent a short period of time in a correctional facility. The theory underlying shock probation was that immersing a defendant in the penal system for a short period of time could "shock" him or her into a noncriminal lifestyle after probation. Campbell, Law of Sentencing (2 Ed.1991) 104. Like other forms of probation, shock probation was in the nature of a privilege rather than a right or entitlement. As with any decision to award probation or suspend sentence, the decision to grant shock probation came as an act of grace to one convicted of a crime. *Escoe v. Zerbst* (1935), 295 U.S. 490, 492, 55 S.Ct. 818, 819, 79 L.Ed. 1566, 1568; *Varner*, 166 Ohio St. at 343, 2 O.O.2d at 252, 142 N.E.2d at 849. That the General Assembly chose to place this decision within the plenary discretion of the sentencing court is not surprising. Probation has always been viewed as a matter that lies within the judgment of the trial judge. See *State v. Theisen* (1957), 167 Ohio St. 119, 124, 4 O.O.2d 122, 125, 146 N.E.2d 865, 869.

While we recognize that appellate review is an important procedural safeguard for the rights of defendants, it must be kept in mind that by the time defendants move the sentencing court for shock probation, many procedural safeguards have already been afforded to them. They have been seized in a constitutional manner, confronted by their accusers and the witnesses against them, and tried

shall determine whether such * * * person shall be released upon the same conditions as the original parole or paroled upon different conditions or shall be imprisoned in a penal or reformatory institution." 1953 H.B. No. 1.

before a jury of their peers, convicted, and sentenced to punishment. *Varner,* 166 Ohio St. at 344, 2 O.O.2d at 252, 142 N.E.2d at 849. From this conviction, defendants have had a specific right of appeal. *Theisen,* 167 Ohio St. at 124, 4 O.O.2d at 125, 146 N.E.2d at 869.

The kinds of procedural safeguards available to a defendant after conviction depend upon the nature of the private interest at stake. Because under former R.C. 2947.061(B) the defendant's interest does not rise to the level of a substantial right, the defendant's safeguards are found not in further appellate review, but rather in the trial judge's sworn obligation to uphold the law and apply it with impartiality. See R.C. 3.23. We are confident that, in reviewing motions for shock probation, the trial courts have carried out their duties under the law with a "conscientious, fairminded and humane viewpoint," *Varner,* 166 Ohio St. at 347, 2 O.O.2d at 253, 142 N.E.2d at 851, and will continue to do so with respect to any future motions brought under former R.C. 2947.061(B).

Finally, we reject the view that the denial of a motion for shock probation should be reviewable as a final appealable order if it constitutes a constitutional or statutory violation. See *Bauer,* 1987 WL 9740, and *Delaney,* 9 Ohio App.3d 47, 9 OBR 50, 458 N.E.2d 462. The logic underlying this view is circular. Whether the trial court violated some constitutional or statutory standard in denying a motion for shock probation can only be determined through a review of the trial court's decision. However, once the appellate court agrees to conduct this review, it has already treated the trial court's decision as a final appealable order. Thus, the appellate court has implicitly determined that the trial court's decision is a final appealable order before it even begins to review the decision for constitutional and statutory violations.

As the Second Appellate District recognized in *Brandon,* 86 Ohio App.3d 671, 621 N.E.2d 776, to hold that a trial court's order denying shock probation is reviewable if there is a constitutional or statutory violation begs the question. A trial court's order denying shock probation is either reviewable or it is not reviewable. *Id.* at 676, 621 N.E.2d at 779. We cannot hold that this order is sometimes reviewable and sometimes not. *Id.*

For the foregoing reasons, we conclude that a trial court's order denying shock probation pursuant to former R.C. 2947.061(B) is not a final appealable order regardless of whether the denial constitutes a constitutional or statutory violation. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

Resnick, Cook and Lundberg Stratton, JJ., concur.

Cook, J., concurs separately.

Moyer, C.J., Douglas and Pfeifer, JJ., dissent.

---

**Cook, J., concurring.** I affirm on the sole basis that the denial of a motion for shock probation does not affect a substantial right, without reaching the issue of whether the determination of a motion for shock probation is a special proceeding within the meaning of R.C. 2505.02(A)(2).

---

**Douglas, J., dissenting.** While I agree with the majority that the denial of a motion for shock probation is not a final appealable order pursuant to the special proceeding/substantial right provision of R.C. 2505.02, I believe such denial is appealable pursuant to R.C. 2505.02(B)(4)(a) and (b). R.C. 2505.02 provides:

"(B) An order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following:

" * * *

"(4) An order that grants or denies a provisional remedy and to which both of the following apply:

"(a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.

"(b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action."

I believe that this language now makes the denial of a motion for shock probation a final order.

Moyer, C.J., and Pfeifer, J., concur in the foregoing dissenting opinion.

---

*W. Duncan Whitney*, Delaware County Prosecuting Attorney, and *Rosemary E. Rupert*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, and *Theresa G. Haire*, Assistant Public Defender, for appellant.

THE STATE OF OHIO, APPELLEE, *v.* HLAVSA, APPELLANT.

[Cite as *State v. Hlavsa* (2001), 91 Ohio St.3d 131.]

(No. 00–1177—Submitted January 31, 2001—Decided March 7, 2001.)

———————

The judgment of the court of appeals relating to the counts of anal rape is reversed, and the cause is remanded for a new trial on those counts pursuant to the decision and opinion in *State v. Wells* (2001), 91 Ohio St.3d 32, 740 N.E.2d 1097.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

HOWARD, APPELLANT, *v.* SPORE, JUDGE, APPELLEE.

[Cite as *Howard v. Spore* (2001), 91 Ohio St.3d 131.]

(No. 00–1645—Submitted December 12, 2000—Decided March 7, 2001.)

———————

*Per Curiam.* Appellant, Gregory T. Howard, filed a personal injury action in the Toledo Municipal Court. Appellee, Judge Judson P. Spore of the Perrysburg Municipal Court, was assigned to the case.

In July 1999, Howard filed a motion for new trial or to amend findings and judgments. In the same motion, Howard filed an affidavit of disqualification against Judge Spore.

In 2000, Howard filed a complaint in the Court of Appeals for Lucas County for a writ of procedendo to compel Judge Spore to rule on his pending motions. Howard also requested a writ of mandamus to compel Judge Spore to report alleged ethical misconduct by an opposing attorney in the underlying case. Judge Spore filed a motion to dismiss.

In his appeal of right, Howard essentially contends that the court of appeals erred in dismissing his action in procedendo and mandamus. For the following reasons, Howard's contention is meritless.

Howard is not entitled to a writ of procedendo because Judge Spore neither refused nor unnecessarily delayed proceeding to judgment. *State ex rel. Weiss v. Hoover* (1999), 84 Ohio St.3d 530, 532, 705 N.E.2d 1227, 1229. Under R.C. 2701.031(D)(1), Howard's affidavit of disqualification prevented Judge Spore from ruling on Howard's substantive motions in the underlying case until the presiding judge of the common pleas court decided the affidavit. See *State ex rel. Kreps v. Christiansen* (2000), 88 Ohio St.3d 313, 317–318, 725 N.E.2d 663, 667.

Further, Howard is not entitled to a writ of mandamus to compel Judge Spore to report ethical misconduct because Howard has or had an adequate legal remedy by filing a grievance under Gov.Bar R. V. See *State ex rel. Forsyth v. Brigner* (1999), 86 Ohio St.3d 299, 300, 714 N.E.2d 922, 923–924 ("A plain and adequate remedy in the ordinary course of law precludes extraordinary relief in mandamus"); cf. *Christensen v. Bd. of Commrs. on Grievances & Discipline* (1991), 61 Ohio St.3d 534, 537, 575 N.E.2d 790, 792 ("[The] disciplinary procedure is the equivalent of [an] appeal * * * and is an adequate remedy at law"). Further, to the extent that Howard may have already unsuccessfully invoked this alternate remedy, he may not relitigate the same issue by way of mandamus. *State ex rel. Smith v. Fuerst* (2000), 89 Ohio St.3d 456, 457, 732 N.E.2d 983, 985.

Based on the foregoing, the court of appeals properly dismissed the case. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., not participating.

———

*Gregory T. Howard, pro se.*

*Rayle, Matthews & Coon* and *Max E. Rayle,* for appellee.

THE STATE EX REL. SHERRILLS, APPELLANT, *v.* THE STATE OF OHIO, APPELLEE.

[Cite as *State ex rel. Sherrills v. State* (2001), 91 Ohio St.3d 133.]

(No. 00–1658—Submitted January 9, 2001—Decided March 7, 2001.)

*Per Curiam.* In July 2000, appellant, inmate Daries Sherrills, filed a complaint in the Court of Appeals for Cuyahoga County for a writ of mandamus to compel appellee, state of Ohio, to order that the journal in a case in that court reflect the truth and to file his brief in which he raised a claim of ineffective assistance of appellate counsel. Sherrills alternatively sought a writ of habeas corpus to compel his immediate release from prison. The court of appeals *sua sponte* dismissed the cause. *State ex rel. Sherrills v. State* (Aug. 3, 2000), Cuyahoga App. No. 78261, unreported, 2000 WL 1060605.

In this cause now before the court upon Sherrills's appeal as of right, we find that the court of appeals correctly dismissed Sherrills's claims for extraordinary relief.

As the court of appeals held, Sherrills's complaint is defective because he failed to name the proper respondents and did not include their addresses. Civ.R. 10(A); R.C. 2725.04(B); *State ex rel. Keener v. Amberley* (1997), 80 Ohio St.3d 292, 293, 685 N.E.2d 1247, 1248; *State ex rel. Jackson v. Lucas Cty.* (Mar. 5, 1996), Lucas App. No. L–96–049, unreported, 1996 WL 171550; *State ex rel. Lacavera v. Cuyahoga Cty. Court of Common Pleas* (Mar. 2, 2000), Cuyahoga App. No. 77359, unreported, 2000 WL 235748 ("although the State of Ohio is listed as the respondent [in relator's mandamus action], he seeks relief from the 'clerk of courts' and the 'court' ").

Moreover, to the extent that Sherrills requests a writ of habeas corpus, he failed to attach his commitment papers to his complaint. R.C. 2725.04(D); *Sidle v. Ohio Adult Parole Auth.* (2000), 89 Ohio St.3d 520, 733 N.E.2d 1115.

134

Based on the foregoing, we affirm the judgment of the court of appeals.[1]

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Daries Sherrills, pro se.*

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Diane Smi-lanick,* Assistant Prosecuting Attorney, for appellee.

BUOSCIO, APPELLANT, *v.* BAGLEY, WARDEN, APPELLEE.

[Cite as *Buoscio v. Bagley* (2001), 91 Ohio St.3d 134.]

(No. 00–1691—Submitted January 31, 2001—Decided March 7, 2001.)

---

*Per Curiam.* In July 1991, a Summit County Grand Jury returned an indictment charging appellant, Samuel Buoscio, with aggravated murder, having a weapon while under a disability, and various specifications. The Summit County Court of Common Pleas granted the state's motion to amend the aggravated murder charge to voluntary manslaughter, and Buoscio pled guilty to the amended charge and an accompanying firearm specification. In January 1992, the common pleas court sentenced Buoscio to an aggregate prison term of thirteen to twenty-eight years.

In July 2000, Buoscio filed a petition in the Court of Appeals for Richland County for a writ of habeas corpus to compel his immediate release from prison. Buoscio claimed that the common pleas court lacked jurisdiction to amend his indictment and convict and sentence him for voluntary manslaughter. In August

---

1. We also deny Sherrills's motions to supplement and amend the record.

2000, the court of appeals *sua sponte* dismissed the petition because of "petitioner's failure to demonstrate on the face of said Petition that same was served upon the named respondent [Buoscio's prison warden]."

In his appeal of right, Buoscio claims that the court erred by dismissing his petition based on his failure to include a proof of service in his petition. His warden counters that the court of appeals was required to dismiss the petition because of the mandatory language of Civ.R. 5(D).[1] For the following reasons, we hold that although the court's rationale was incorrect, it did not err in dismissing the petition.

The court of appeals dismissed Buoscio's petition because his petition did not include any proof of service. This reason is incorrect. "[W]hatever the applicability of a particular Civil Rule, it is evident that R.C. Chapter 2725 prescribes a basic, summary procedure for bringing a habeas action." *Pegan v. Crawmer* (1995), 73 Ohio St.3d 607, 608–609, 653 N.E.2d 659, 661. Service of the petition and the ordering of a return are required only if the petition states a facially valid claim and the court allows the writ. *Id.*, 73 Ohio St.3d at 609, 653 N.E.2d at 661; *State ex rel. Crigger v. Ohio Adult Parole Auth.* (1998), 82 Ohio St.3d 270, 271, 695 N.E.2d 254, 255.

In addition, even if the Rules of Civil Procedure regarding service were applicable here, Civ.R. 5(D) would still not apply to Buoscio's petition because it "governs the filing with the court of pleadings and papers *subsequent to the filing of the original complaint.*" (Emphasis deleted and new emphasis added.) Staff Note to July 1, 1971 Amendment of Civ.R. 5(D).

Nevertheless, we are not authorized to reverse a correct judgment merely because erroneous reasons were given by the court of appeals. See *Page v. Riley* (1999), 85 Ohio St.3d 621, 624, 710 N.E.2d 690, 693, and cases cited therein.

Dismissal of Buoscio's petition was warranted because he challenged the validity or sufficiency of his indictment, as amended, and this claim is not cognizable in habeas corpus. See *State ex rel. Raglin v. Brigano* (1998), 82 Ohio St.3d 410, 696 N.E.2d 585 (affirmance of dismissal of habeas corpus petition claiming trial court improperly amended indictment charge of murder to a charge of involuntary manslaughter); cf., also, *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274 (voluntary manslaughter is an inferior-degree offense of murder).

---

1. Civ.R. 5(D) provides that "[a]ll papers, after the complaint, required to be served upon a party shall be filed with the court within three days after service [and that] [p]apers filed with the court shall not be considered until proof of service is endorsed thereon or separately filed."

Based on the foregoing, although the court's rationale was incorrect, its dismissal of Buoscio's petition was proper. Therefore, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Samuel Buoscio, pro se.*

*Betty D. Montgomery,* Attorney General, and *Karen E. Carter,* Assistant Attorney General, for appellee.

THE STATE EX REL. AVALOTIS PAINTING COMPANY, INC., APPELLANT,
*v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Avalotis Painting Co. v. Indus. Comm.* (2001), 91 Ohio St.3d 137.]

(No. 99–1029—Submitted January 9, 2001—Decided March 14, 2001.)

*Per Curiam.* Avalotis Painting Company ("Avalotis"), appellant, sought a writ of mandamus to vacate appellee Industrial Commission of Ohio's order finding Avalotis in violation of a specific safety requirement ("VSSR"). The Court of Appeals for Franklin County denied the writ, finding that the commission did not abuse its discretion in granting this VSSR. Avalotis appeals as of right.

In September 1994, appellee Robert Gordon suffered traumatic injuries when he fell four stories while painting in an industrial building for Avalotis. He was standing on one narrow I-beam in order to paint another beam above him when he lost his balance and landed on the concrete floor below. At the time of his accident, no lifeline from which Gordon could have tied off had been rigged, and he had no other way both to secure himself and paint where his foreman had instructed him to work.

Gordon's workers' compensation claim was recognized for a host of conditions, including paraplegia. He applied for additional compensation, alleging Avalotis's VSSR, and the commission granted his application. The commission determined that Avalotis had violated Ohio Adm.Code 4121:1–3–03(J)(1), which required that employers "provide" lifelines, safety belts, and lanyards, and that employees "wear" them when working more than fifteen feet above ground. The commission premised its ruling on the findings that (1) a lifeline, or safety cable, could have been rigged at the specific site to which Gordon's foreman assigned him, allowing Gordon to tie off with his harness and lanyard; and (2) Avalotis failed to provide this safety protection by rigging it for Gordon's use. The commission further justified its order by finding that Gordon's foreman had specifically instructed Gordon to work without the required lifeline when he ordered Gordon to "skin" out on the beams to paint them.[1]

---

1. "Skinning" is a practice whereby the painter ties off to the beam he sits on or straddles and then paints within his reach.

The court of appeals rejected Avalotis's argument that Gordon bore responsibility for rigging his own lifeline in his work area and that his injury therefore resulted from his own failure to use this safety equipment, which was available elsewhere at the worksite. The court instead found that the commission could reasonably construe Ohio Adm.Code 4121:1–3–03(J)(1) to assign the employer this responsibility, such that Avalotis's failure to put this equipment in place was the same as not having it at all. The court further found that while the commission sufficiently explained the evidence and reasoning necessary for its VSSR award, it had no basis for finding that Gordon's supervisor had specifically ordered him to paint "without any safety equipment."

Three issues are presented for our review: (1) Did the commission abuse its discretion in finding that Avalotis had to rig the lifeline in order to "provide" it for the purpose of Ohio Adm.Code 4121:1–3–03(J)(1)? (2) Did the commission abuse its discretion in finding that Gordon's foreman instructed him to paint in specific disregard of the need for a lifeline? and (3) Did the commission abuse its discretion in granting this VSSR? For the reasons that follow, we find that (1) the commission had authority to construe this rule as requiring this employer to put a lifeline in place for Gordon's use; (2) by telling Gordon to skin out on the beams to paint them, his foreman effectively ordered him to paint without a lifeline; and (3) evidence of record established that Avalotis had not rigged the required lifeline, and the commission adequately explained this in its order. Accordingly, we affirm the judgment to deny a writ of mandamus, albeit on a partially different basis than that provided in the court of appeals' order.

### Ohio Adm.Code 4121:1–3–03(J)(1)

Ohio Adm.Code 4121:1–3–03(J)(1) provided [2]:

"Lifelines, safety belts and lanyards shall be provided by the employer and it shall be the responsibility of the employee to wear such equipment when * * * exposed to hazards of falling [because] the operation being performed is more than fifteen feet above ground or above a floor or platform * * *. Lifelines and safety belts shall be securely fastened to the structure * * *." 1979–1980 OMR 4–25, 4–28.

A "lanyard" is "a rope, suitable for supporting one person. One end is fastened to a safety belt or harness and the other end is secured to a substantial object or a safety line." A "lifeline" is defined as "a rope suitable for supporting one person to which a lanyard or safety belt (harness) is attached." A "safety belt or harness" is "a device, worn around the body, which, by reason of its attachment

---

2. Ohio Adm.Code 4121:1–3–03(J)(1) was amended effective April 1, 1999. See 1998–1999 OMR 843, 846.

to a lanyard and lifeline or a structure, will prevent an employee from falling." Ohio Adm.Code 4121:1–3–03(B)(2), (3), and (7). To "provide" this equipment means to make it "available," which requires the employer to supply the equipment at some point before it is needed. Ohio Adm.Code 4121:1–3–01(B)(20); *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.* (2000), 88 Ohio St.3d 190, 193, 724 N.E.2d 778, 780; *State ex rel. Mayle v. Indus. Comm.* (1999), 86 Ohio St.3d 74, 711 N.E.2d 687.

Avalotis argues that in assigning the responsibility to actually rig a lifeline to the employer, the commission's construction tacks onto Ohio Adm.Code 4121:1–3–03(J)(1) an additional requirement without prior notice. Moreover, since specific safety requirements are unenforceable to the extent they fail to "plainly apprise" employers of their legal obligations to employees, *State ex rel. Waugh v. Indus. Comm.* (1997), 77 Ohio St.3d 453, 456, 674 N.E.2d 1385, 1388, Avalotis maintains that it is not liable for this VSSR. Avalotis further argues that since the required lifeline was "available" to Gordon before he began painting on the day he fell, Avalotis actually complied with the safety requirement and, therefore, had no liability under the "unilateral negligence" defense.[3]

The court of appeals rejected these arguments, again because the lifeline was not in place at the site from which Gordon fell. The court explained:

"[T]he commission did not abuse its discretion in defining and applying 'provide' * * * to the facts of this case. Specifically, we find that the commission did not abuse its discretion when it interpreted Ohio Adm.Code 4121:1–3–03(J) to require the employer to have a lifeline in place in the area where their employees are instructed to work. A lifeline is useless if it's not in place for the employee to tie off. This interpretation is reasonable and logical and, therefore, affords [Avalotis] notice of its obligation pursuant to the code."

In reaching this conclusion, the court of appeals adopted its magistrate's report, which distinguished a lifeline from either a lanyard or a safety belt because, under Ohio Adm.Code 4121:1–3–03(J)(1), the employee is accountable only for equipment that is "worn," i.e., "a 'lifeline' cannot be worn." We agree, especially since, in this case, rigging a lifeline was not even one of Gordon's job duties.

Testimony showed that the responsibility for rigging this particular lifeline belonged to another shift and, furthermore, that it required a crew of employees to do it. Thus, while Gordon, who knew how to rig a lifeline, could have been more cautious and demanded the installation of a lifeline from his foreman, as a

---

3. "Unilateral negligence" is a defense to VSSR liability when an employer makes requisite equipment available but the employee chooses not to use it. *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.* (2000), 88 Ohio St.3d 190, 193, 724 N.E.2d 778, 780.

practical matter, it was not his job. He, therefore, had no basis to enforce this specific safety requirement, particularly after his foreman had just told him what he was to do and where.

Accordingly, the commission was justified in applying Ohio Adm.Code 4121:1–3–03(J)(1) as it did in this context.

### Foreman's Instruction

The commission found that by directing Gordon to skin out on beams to paint them, Gordon's foreman specifically ordered him to work without a lifeline. Avalotis claims that the commission ignored testimony describing the practice of skinning and found a VSSR because Gordon's foreman told him to paint without any safety protection *whatsoever*. The court of appeals agreed and consequently found an abuse of discretion because no evidence supported the conclusion that skinning was performed, in effect, without tying off at all.

The court of appeals considered this abuse of discretion harmless in view of the other evidence establishing the instant VSSR; however, we see no abuse of discretion at all. Evidence in the record supports the commission's conclusion. Gordon's foreman testified that while he knew Gordon's work area had not been rigged with a lifeline, he thought that a lifeline could not be rigged in that space and that skinning was the only way to get the job done. He was wrong on all counts. A lifeline was rigged shortly after Gordon's accident, and Ohio Adm. Code 4121:1–3–03(J)(1) does not allow skinning in place of the protection provided by a lifeline.

Accordingly, we find that the court of appeals erred in discrediting this part of the commission's VSSR order.

### Evidence of a VSSR

The court of appeals found evidence from which the commission could determine a VSSR, holding:

"[W]e conclude that the commission did not abuse its discretion when it determined that [Avalotis] failed to provide the requisite safety equipment. There was 'some evidence' in the record to support the commission's determination that the area where claimant was working was not rigged with a lifeline; that the claimant was too far away from any other objects to which he could have tied off; that looping his lanyard around the beam on which he was working would have made it impossible to perform the work he was instructed to do; and that the claimant was, indeed, instructed by his foreman * * * to work in an area [that] was not rigged with a lifeline."

Avalotis contends that the commission failed to articulate precisely how it violated the standard in Ohio Adm.Code 4121:1–3–03(J)(1), but the court of appeals summarily dispensed with this argument and rightly so. It observed:

"[T]he commission did comply with [*State ex rel. Noll v. Indus. Comm.* (1991), 57 Ohio St.3d 203, 567 N.E.2d 245]. There was no rigging for [Gordon] to tie off where he was ordered to work. That alone is a sufficient explanation as to how [Avalotis] failed to make a lifeline available."

Based on the foregoing, the commission did not abuse its discretion in any respect by finding Avalotis in violation of Ohio Adm.Code 4121:1–3–03(J)(1). Accordingly, we affirm the judgment denying a writ of mandamus to vacate the commission's order.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Vorys, Sater, Seymour & Pease, L.L.P.*, and *Robert A. Minor*, for appellant.

*Betty D. Montgomery*, Attorney General, and *William J. McDonald*, Assistant Attorney General, for appellee Industrial Commission of Ohio.

MUENCHENBACH ET AL., APPELLANTS, *v.* PREBLE COUNTY, OHIO, ET AL., APPELLEES.

[Cite as *Muenchenbach v. Preble Cty.* (2001), 91 Ohio St.3d 141.]

142

(No. 99–1930—Submitted September 12, 2000—Decided March 14, 2001.)

ALICE ROBIE RESNICK, J. On October 24, 1995, plaintiffs-appellants, Richard, Geraldine, and Ruth Muenchenbach, were driving north on West Florence–Campbellstown Road in Jackson Township, Preble County. As they passed the intersection of West Florence–Campbellstown Road and State Route 122, appellants drove by a small "men working" sign and two Preble County pickup trucks. After traveling about another mile and a half, appellants encountered a four-wheeled 1983 Ford Model 5610 tractor, equipped with a street-sweeping brush on the front and a scraper blade on the back, sitting motionless on the east side of the road. Richard slowed his own vehicle, sounded his horn, and attempted to pass the vehicle on the left. At that time, the tractor, which was operated by William House, a highway service worker employed by the Preble County Engineer, made a sudden left turn toward a private driveway and struck appellants' vehicle, causing it to leave the roadway and roll over into a field.

Appellants filed a negligence action against defendants-appellees, Preble County, the Board of Commissioners of Preble County, and the Preble County Engineer. The trial court granted summary judgment in favor of appellees on the basis that they were immune from liability under R.C. 2744.02(A)(1), and the court of appeals affirmed the judgment. In so doing, both courts held that the exception to immunity contained in R.C. 2744.02(B)(1) did not apply because appellants' damages were not caused by the negligent operation of a "motor vehicle" as that term is defined in R.C. 4511.01(B). In particular, they found that the vehicle operated by House was not a motor vehicle under R.C. 4511.01(B) because it constituted excepted construction equipment.

The cause is now before this court pursuant to the allowance of a discretionary appeal.

The issues presented in this case involve whether the vehicle in question was a motor vehicle pursuant to R.C. 4511.01(B), whether the immunity provided in the exception found in R.C. 2744.02(B)(1) attaches under the facts of this case, and whether, as a result of the above inquiries, material questions of fact exist that prevent the granting of summary judgment in favor of appellees.

R.C. 2744.02(A)(1) provides:

"Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

R.C. 2744.02(B)(1) sets forth the following exception to this broad grant of immunity:

"Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent operation of any *motor vehicle* by their employees upon the public roads, highways, or streets when the employees are engaged within the scope of their employment and authority." (Emphasis added.)

Since R.C. 2744.01(E) provides that for purposes of R.C. 2744.02, "motor vehicle" has the same meaning as in R.C. 4511.01, the question is whether the vehicle in this case is a motor vehicle as defined in R.C. 4511.01.

R.C. 4511.01(B) defines "motor vehicle" as follows:

" 'Motor vehicle' means every vehicle propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires, *except* motorized bicycles, road rollers, traction engines, power shovels, power cranes, and *other equipment used in construction work and not designed for or employed in general highway transportation,* hole-digging machinery, well-drilling machinery, ditch-digging machinery, farm machinery, trailers used to transport agricultural produce or agricultural production materials between a local place of storage or supply and the farm when drawn or towed on a street or highway at a speed of twenty-five miles per hour or less, threshing machinery, hay-baling machinery, agricultural tractors and machinery used in the production of horticultural, floricultural, agricultural, and vegetable products, and trailers designed and used exclusively to transport a boat between a place of storage and a marina, or in and around a marina, when drawn or towed on a street or highway for a distance of no more than ten miles and at a speed of twenty-five miles per hour or less." (Emphasis added.)

Since the only dispute in this case concerns the application of the italicized exception, the determinative issue narrows to whether the vehicle operated by House constitutes "other equipment used in construction work and not designed for or employed in general highway transportation."

In addressing this issue, the courts below considered the decision of the Court of Appeals for Cuyahoga County in *Putka v. Parma* (1993), 90 Ohio App.3d 647, 630 N.E.2d 380. In that case, the plaintiffs' decedent was struck and killed by a city-owned Model 680 H Construction King backhoe as she crossed the intersection of Spring Garden Road and Ridge Road in Parma, Ohio. At the time of the accident, the backhoe was being driven by a city employee from the city service garage to a work site. Otherwise, the vehicle was used exclusively in construction work and not designed to be operated on streets and highways.

The city claimed that it was immune from liability pursuant to R.C. Chapter 2744 on the basis that the backhoe was excepted from the definition of motor vehicle under R.C. 4511.01(B) as "other equipment used in construction work and not designed for or employed in general highway transportation," and also as "hole-digging machinery" and "ditch-digging machinery." In rejecting the city's claim, the court in *Putka* applied the following test:

"[A] backhoe is not a 'motor vehicle' within the provision of R.C. 4511.01(B) if it is used for its intended purpose; however, where a backhoe is operated on the public road like any other vehicle, it cannot be exempt as a matter of law from being classified as a 'motor vehicle' on the pretext that it traveled a short distance." *Id.*, 90 Ohio App.3d at 652, 630 N.E.2d at 383.

The court explained that "any implication that a vehicle can roam around the public road and not be treated as a 'motor vehicle' within the meaning of R.C. 4511.01(B) would be inconsistent with the intent of the legislative exemptions. The exempted vehicles must be used for their intended purposes in order for the exemption to lie. * * * An exemption cannot be given based on what a vehicle's supposed function should be, but what it was being used for at the time of the incident." *Id.*, 90 Ohio App.3d at 651, 630 N.E.2d at 383.

The trial court in the present case found the reasoning in *Putka* "logical and sound and therefore persuasive." However, the trial court found that the accident in this case occurred while the vehicle was being used in construction work, rather than in general highway transportation, and rejected appellants' affidavit statements to the contrary. The court of appeals distinguished *Putka* on the basis that "the accident in this case occurred within the construction zone," and also rejected appellants' affidavits.

A large portion of appellants' affidavits is admittedly conclusory in nature. The affidavits submitted by appellees are also conclusory to the extent that they recite the definitional language of the statute. Indeed, the evidence in this case consists entirely of these affidavits, answers to interrogatories, an accident report, and several copies of photographs of the vehicle. Nevertheless, a careful examination of the record reveals that, aside from the conclusory allegations, there is sufficient evidence to create a genuine issue of material fact under the so-called "use standard" as applied to the construction equipment exception to the definition of "motor vehicle" in R.C. 4511.01(B).

According to the affidavits submitted by appellees, House was working for the County Engineer on a road construction project that entailed repaving West Florence–Campbellstown Road between State Route 122 and Crawfordsville–Campbellstown Road. "Construction zone" and "men working" signs were posted at both intersections north and south of the "country block." The vehicle that House was operating on October 24, 1995, was equipped with a "slow-moving

vehicle" reflector sign and two large yellow flashing lights mounted on the cab. At the time of the accident, House had just completed packing gravel berm on the east side of the highway, and was preparing to turn left into a private drive so that he could turn around and head south in order to pack down freshly dumped gravel on West Florence–Campbellstown Road.

According to appellants' affidavits, there was one small "men working" sign approximately fifteen to twenty feet north of State Route 122, but no "construction zone" sign. As they passed this sign, appellants drove between two county pickup trucks, one on each side of West Florence–Campbellstown Road. The employees in these trucks were talking to each other across the road, but did not warn appellants that there was construction work further up the road. As they drove north, appellants first observed the tractor from three-fourths of a mile away, and watched it during their entire approach. The vehicle never moved until the accident; there were no flashing yellow lights or a "slow-moving vehicle" sign on the vehicle; there was no freshly dumped gravel for House to pack down on West Florence–Campbellstown Road south of his position; and House was "by his own statement * * * involved in making a left-hand turn into a private driveway in order to turn the tractor around and return down the road * * * in order to get warm in the county pick up trucks."

Based on this evidence, it appears that a genuine issue of fact remains as to whether the vehicle in this case was employed in general highway transportation at the time of the accident. Accordingly, the application of a use standard compels the conclusion that summary judgment is not appropriate under Civ.R. 56(C).

However, appellees challenge the concept of a use standard as being in derogation of the statutory language and propose that we classify all vehicles equipped for and used in construction work as excepted construction equipment, regardless of how they were used at the time of the accident. It appears to be appellees' overall contention that the limiting or modifying language "used in construction work and not designed for or employed in general highway transportation" signifies an intent to classify "other equipment" on the basis of a vehicle's inherent qualities, or its general, principal, or dedicated use, rather than on the basis of its current actual use. However, the arguments advanced by appellees, and the authorities on which they rely, convince us that the opposite is true.

In *Wauseon v. Badenhop* (1984), 9 Ohio St.3d 152, 9 OBR 442, 459 N.E.2d 867, the court held that a farm tractor is a "vehicle" for purposes of conviction under R.C. 4511.19, but it is not a "motor vehicle" for purposes of a license suspension under R.C. 4507.16. In so holding, we relied on R.C. 4507.03, which provides that no person shall be required to obtain an operator's license for the purpose of driving "any farm tractor * * * temporarily drawn, moved, or propelled upon the

highway," and R.C. 4501.01(B), which specifically excludes "agricultural tractors" from the definition of "motor vehicle." *Id.*, 9 Ohio St.3d at 154, 9 OBR at 443, 459 N.E.2d at 869.

At the time that Badenhop was cited for driving under the influence of alcohol, he was driving the farm tractor pulling two farm wagons of people on a hayride in the city of Wauseon. Appellees correctly observe that our decision in *Badenhop* "did not cause a specifically excluded vehicle to transform into a 'motor vehicle' simply because it was being operated on a public road." More to the point, our decision to classify the tractor in *Badenhop* as an excepted agricultural tractor under R.C. 4501.01(B) was not affected by how it was being used at the time of the citation. Appellees argue, therefore, that the classification of the tractor in the present case as excepted construction equipment under R.C. 4511.01(B) should likewise not depend upon its use at the time of the accident. We disagree.

R.C. 4501.01(B) and 4511.01(B) except agricultural tractors from the definitions of "motor vehicle" on the basis of their principal use, rather than on the basis of their use at any particular time. Under the definitions of "agricultural tractor" in R.C. 4501.01(C) and 4511.01(J), a vehicle is classified as an agricultural tractor when "used principally for agricultural purposes."

In contrast, R.C. 4501.01(B) and 4511.01(B) do not except construction equipment from the definition of "motor vehicle" on the basis of its principal use or dedicated purpose. They do not provide that construction equipment is excepted when used "principally," "primarily," or "generally" for construction purposes, or in construction work. They do provide that, in order for other equipment used in construction work to be excepted, it must not be "employed in general highway transportation." The term "general" is very clearly used not to modify the term "employed," but to modify "highway transportation." We believe that if the General Assembly intended for construction equipment to be classified and excepted according to its principal, primary, general, or dedicated use, regardless of how used when it causes damage or injury, then it is incumbent upon the General Assembly to so provide.

Moreover, the court's determination in *Badenhop* was premised on the interplay of three code sections—R.C. 4501.01(B), 4507.16, and 4507.03. The application of a use standard is arguably inconsistent with the licensing exemptions granted under R.C. 4507.03, which provides:

"No person shall be required to obtain a driver's or commercial driver's license for the purpose of driving or operating a road roller, road machinery, or any farm tractor or implement of husbandry, *temporarily drawn, moved, or propelled upon the highway.*" (Emphasis added.)

However, the application of a use standard is entirely consistent with the traffic law exemptions granted under R.C. 4511.04, which provides:

"Sections 4511.01 to 4511.78, inclusive, section 4511.99, and sections 4513.01 to 4513.37, inclusive, of the Revised Code do not apply to * * * *other equipment while actually engaged in work* upon the surface of a highway within an area designated by traffic control devices, but apply to such * * * vehicles *when traveling to or from such work.*

"The drivers of * * * other vehicles utilized in * * * road surface maintenance, *while engaged in work upon a highway,* * * * shall be exempt from criminal prosecutions for violations [of specified code sections]. *Such exemption shall not apply to such drivers when their vehicles are not so engaged.*" (Emphasis added.)

In addition, aside from references to "agricultural" or "commercial" tractors, each time the term "tractor" appears generally in R.C. Chapter 4511, it is modified or qualified by the phrase "being used in constructing" or "while being used in * * * construction." See R.C. 4511.64 and 4511.69. Thus, we cannot agree with appellees' assertion that *Badenhop* extends to preclude a use standard from being applied to determine whether a nonagricultural tractor constitutes excepted construction equipment for purposes of immunity under R.C. 2744.02.

Appellees also rely on *Drake–Lassie v. State Farm Ins. Cos.* (1998), 129 Ohio App.3d 781, 787, 719 N.E.2d 64, 68, where the Court of Appeals for Franklin County found a "use analysis" to be "inconsistent with established rules of statutory construction." Contrary to appellees' assertions, however, *Drake–Lassie* does not stand for the proposition that use standards are inapplicable to "any of the 14 specific exclusions" contained in R.C. 4501.01(B) or R.C. 4511.01(B). Instead, a careful reading of that decision reveals that the court in *Drake–Lassie* rejected the view that holds use standards to be applicable across the board to *all* of the exceptions set forth in these statutes.

The application or rejection of a use standard should not be an all-or-nothing proposition. R.C. 4501.01(B) and 4511.01(B) are syntactically constructed to provide a working definition of "motor vehicle," followed by a series of exceptions. Some of these exceptions are specific in nature and some are general in nature; some are characterized as a type of vehicle and some are distinguished by function. Some of the exceptions are followed by limiting or modifying clauses, or subject to definitional qualifications, while others stand unqualified.

A use standard may be applied to determine whether a vehicle constitutes excepted construction equipment because that exception is subject to the qualification that such equipment not be "employed in general highway transportation." There has been some debate over whether, and to what extent, a use standard properly applies beyond the confines of the exception for construction equipment. See *Floch v. Farmers Ins. Group of Cos.* (1994), 97 Ohio App.3d 394, 397, 646 N.E.2d 902, 904; *Putka, supra,* 90 Ohio App.3d at 653, 630 N.E.2d at 383–384 (Nahra, P.J., dissenting); *State v. Conner* (1983), 13 Ohio App.3d 179, 13 OBR

214, 468 N.E.2d 320; *State v. Devilbliss* (C.P.1961), 16 O.O.2d 404, 406, 88 Ohio Law Abs. 592, 596, 177 N.E.2d 74, 76; 1956 Ohio Atty. Gen. Ops. No. 6474. However, the issue presented in this case has nothing to do with any exception other than the exception for construction equipment, and our decision today is so limited. Thus, it is not necessary for us to determine whether the court in *Putka* went too far in applying a use standard to any of the exceptions not modified by the phrase "not designed for or employed in general highway transportation."

However, we disagree with the statement in *Putka* that a use standard may generally be applied "in determining whether a vehicle is a motor vehicle within the meaning of the statute." *Id.*, 90 Ohio App.3d at 651, 630 N.E.2d at 382. A vehicle is a motor vehicle under R.C. 4511.01(B) if it is "propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires" and does not fall within any of the enumerated exceptions. The use standard can do no more than vitiate the particular exception that justifies its application in the first place; it cannot apply to reformulate a definition of motor vehicle provided by the General Assembly.

Finally, appellees rely on *Berry v. Motorists Mut. Ins. Co.* (1983), 13 Ohio App.3d 228, 13 OBR 280, 468 N.E.2d 922, and *Groff v. Motorists Mut. Ins. Co.* (May 24, 1989), Summit App. No. 13919, unreported, 1989 WL 54705. However, neither the backhoe in *Berry* nor the payloader in *Groff* was employed in general highway transportation at the time of the accident. The accident in *Berry* occurred while the backhoe was being operated off a public road, and the accident in *Groff* occurred while the payloader was performing construction work on a bridge, in a lane that was closed to traffic, with barrels having been set up to keep traffic out of the work area.

For all of the foregoing reasons, we hold that for purposes of R.C. 2744.02(B)(1), a "use standard" is an appropriate test for determining whether a vehicle is excepted from the definition in R.C. 4511.01(B) of "motor vehicle" on the basis that it constitutes "other equipment used in construction work and not designed for or employed in general highway transportation."[1]

Accordingly, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

---

1. We recognize that the determination of whether a particular vehicle falls within a definition of a "motor vehicle" is normally a question of law. However, in the specific circumstances before us in this case, the statutes at issue unavoidably compel an inquiry into whether, as a question of fact, the vehicle under scrutiny fulfilled the terms of R.C. 4511.01(B)'s exception for construction vehicles not "employed in general highway transportation."

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs separately.

MOYER, C.J., and LUNDBERG STRATTON, J., dissent.

COOK, J., dissents.

---

**DOUGLAS, J., concurring.** I concur in the well-reasoned opinion and judgment of the majority. While so doing I continue to adhere to my dissent in *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 662 N.E.2d 287.

---

**MOYER, C.J., dissenting.** In cases involving statutory interpretation, we are constrained by rules mandated both by legislative enactment and our own precedent. The first and foremost of these rules is that when the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply the rules of statutory interpretation. *Symmes Twp. Bd. of Trustees v. Smyth* (2000), 87 Ohio St.3d 549, 553, 721 N.E.2d 1057, 1061, citing *Meeks v. Papadopulos* (1980), 62 Ohio St.2d 187, 190, 16 O.O.3d 212, 213, 404 N.E.2d 159, 161. In such a case, we do not resort to rules of interpretation in an attempt to discern what the General Assembly could have conclusively meant or intended in its debates over a particular statute—we rely only on what the General Assembly has actually said. Because I believe the majority has run afoul of this basic principle, I respectfully dissent.

R.C. 2744.02(A)(1) grants political subdivisions immunity from civil causes of action, subject to several exceptions. The exception at issue here removes immunity from a political subdivision for "the negligent operation of any motor vehicle by their employees upon the public roads * * * when the employees are engaged within the scope of their employment and authority." R.C. 2744.01(B)(1). R.C. 2744.01(E) then provides that for purposes of R.C. 2744.02, the term "motor vehicle" has the same meaning as provided by R.C. 4511.01.

Pursuant to R.C. 4511.01(B):

" 'Motor vehicle' means every vehicle propelled or drawn by power other than muscular power or power collected from overhead electric trolley wires, except * * * other equipment used in construction work and not designed for or employed in general highway transportation * * * ."

As a matter of statutory interpretation, this language is plain and unambiguous, conveys a clear and definite meaning, and, therefore, leaves nothing for us to

interpret. See *Symmes Twp. Bd. of Trustees,* 87 Ohio St.3d at 553, 721 N.E.2d at 1061. The majority, however, has read into this statutory language a "use standard" in an attempt to further clarify that which is already perfectly clear. This approach is contrary to well-established legal principles that exist to guide the courts, and it compels the conclusion that the majority's decision is not appropriate. See *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 517, 715 N.E.2d 1062, 1113 (Moyer, C.J., dissenting).

I concede that application of a "use standard" could have been appropriate if the language of R.C. 4511.01(B) created an exception for "other equipment" without any limitations or restrictions on the phrase "other equipment." In such an instance, the phrase "other equipment" would be ambiguous and our role would be to define what "other equipment" included. But that is not the statute at issue. The General Assembly created an exception for "other equipment used in construction work *and not designed for or employed in general highway transportation.*" (Emphasis added.) R.C. 4511.01(B). The exception in R.C. 4511.01(B) is precise, and the General Assembly has already expressly stated what type of "other equipment" is excluded from the definition of "motor vehicle."

In examining this language, the majority places particular emphasis on the clause "not designed for or employed in general highway transportation." The majority concludes that the final clause, "general highway transportation," controls the entire meaning of the statute. When the entire provision is read in its entirety, however, this emphasis is misplaced.

The "other equipment" exception in R.C. 4511.01(B) contains two distinct qualifications. The first is .that the other equipment must be used in construction. The second qualification, connected to the first by the word "and," is that the equipment not be designed for or employed in general highway transportation. The conjunctive, "and," indicates that the language should be read in its entirety, and that the second clause modifies the first. The modifier "not designed for or employed in general highway transportation," therefore, refers not to a particular use of a specific piece of equipment at a particular moment in time, but to the design and intended "general" use of the equipment.

Put more simply, "equipment used in construction work" suggests two possible images. The first is pickup trucks or automobiles used to transport people to and from the work site. The second type of equipment is heavy machinery, such as steamrollers or tractors, which perform the construction work. There is no question that a pickup truck could very well be used in construction work. But it is also beyond question that a pickup truck is designed for and employed in general highway transportation—its intended general use—and would not fit the exception in R.C. 4511.01(B). Tractors, on the other hand, can be used in construction work, but have not been designed specifically for or employed in

general highway transportation. The word "general" means that which is "most common; usual * * * [or] concerned with the main or overall features." Webster's New World Dictionary (3 Ed.1991) 561. Common sense would cause me to conclude that if given a choice of transporting one's children across town to a soccer match in an automobile or a tractor, the "common" or "usual" selection would be the automobile.

The authority relied upon by the majority further indicates why a "use standard" affronts the plain and unambiguous language of R.C. 4511.01(B). The majority compares the "other equipment" exception in R.C. 4511.01(B) to the definition of an "agricultural tractor" as examined in *Wauseon v. Badenhop* (1984), 9 Ohio St.3d 152, 9 OBR 442, 459 N.E.2d 867. In *Wauseon*, we held that a driver of a farm tractor could not be found to have violated a statute prohibiting the driving of a motor vehicle while intoxicated. We reached this result because a farm tractor was not within the purview of "motor vehicle" as defined by R.C. 4501.01(B). *Id.* at 154, 9 OBR at 443, 459 N.E.2d at 869. In the present case, however, the majority opinion rests on the differences between the definitions in R.C. 4511.01(B) and definitions contained in other similar statutory provisions.

To quote the majority:

"[T]he application of a use standard is entirely consistent with the traffic law exemptions granted under 4511.04, which provides:

" 'Sections 4511.01 to 4511.78, inclusive, section 4511.99, and sections 4513.01 to 4513.37, inclusive of the Revised Code do not apply to * * * *other equipment while actually engaged in work* upon the surface of a highway within an area designated by traffic control devices, but apply to such * * * vehicles *when traveling to or from such work.*

" ' * * *'

"In addition, aside from references to 'agricultural' or 'commercial' tractors, each time the term 'tractor' appears generally in R.C. Chapter 4511, it is modified or qualified by the phrase 'being used in constructing' or 'while being used in * * * construction.' See R.C. 4511.64 and 4511.69. Thus, we cannot agree * * * that *Badenhop* extends to preclude a use standard from being applied to determine whether a nonagricultural tractor constitutes excepted construction equipment for purposes of immunity under R.C. 2744.02." (Emphasis *sic.*) 91 Ohio St.3d 141, 147, 742 N.E.2d 1128, 1132.

The majority overlooks an important distinction between R.C. 4511.64, 4511.69, and 4511.01(B). The provisions cited by the majority to support its conclusion expressly adopt a "use standard," whereas R.C. 4511.01(B) does not.

Similar statutory provisions in R.C. Chapter 4511 express limitations such as "being used in constructing," R.C. 4511.64, or "while being used in * * *

construction," R.C. 4511.64 and 4511.69. This expressly stated language is the "use standard" limitation that the majority reads into R.C. 4511.01(B). This statutory direction provides that an exception exists only when the vehicle is being used in the manner indicated. Significantly, this same language is absent from R.C. 4511.01(B). Under the "other equipment" exception in R.C. 4511.01(B), there are no words limiting the exception. The General Assembly is presumed to know its own legislation and to have purposefully created distinctions in statutes that appear in the same chapter of the Code. The General Assembly, therefore, did not include a "use standard" within the express language of R.C. 4511.01(B).

As a practical matter, imposing a "use standard" on the language of R.C. 4511.01(B) is logically confusing. The majority's "use standard" implies that had the accident at issue occurred while the tractor was actually doing the work it was designed to do, it would not have been a motor vehicle and immunity would have attached. But because the tractor "had just completed packing gravel berm on the east side of the highway, and was preparing to turn left into a private drive so that he could turn around and head south in order to pack down freshly dumped gravel," 91 Ohio St.3d at 145, 742 N.E.2d at 1131, the tractor, for a brief moment in time, is deemed to be a vehicle designed for or generally used in highway transportation. This conclusion produces a result that seeks logical support.

It is evident from the language of R.C. 4511.01(B) that a tractor is a vehicle that is "other equipment used in construction work and not designed for or employed in general highway transportation." The rules of statutory interpretation are well settled. Where, as here, the language is clear and unambiguous and conveys a clear meaning, our interpretive inquiry is at an end. See *Symmes Twp. Bd. of Trustees*, 87 Ohio St.3d at 553, 721 N.E.2d at 1061; *Bryant v. Dayton Casket Co.* (1982), 69 Ohio St.2d 367, 369, 23 O.O.3d 341, 342, 433 N.E.2d 142, 144. Because the majority opinion eschews basic principles of statutory interpretation and produces a result inconsistent with the clear meaning of R.C. 4511.01(B), I respectfully dissent. We should affirm the judgment of the court of appeals.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

---

COOK, J., dissenting. I would affirm the judgment of the court of appeals for the reasons expressed in its opinion.

---

*Taft, Stettinius & Hollister, L.L.P.*, and *Gerald J. Rapien*; and *Herd L. Bennett*, for appellants.

*Berlon & Timmel* and *David J. Balzano*; and *Christopher L. Englert,* Preble County Assistant Prosecuting Attorney, for appellees.

OFFICE OF DISCIPLINARY COUNSEL *v.* LACOUR.

[Cite as *Disciplinary Counsel v. LaCour* (2001), 91 Ohio St.3d 154.]

(No. 00–1563—Submitted October 17, 2000—Decided March 7, 2001.)

*Per Curiam.* In September 1988, several, but not all, of the plaintiffs in a pending case in the United States District Court, Southern District of Ohio, engaged respondent, Louis Bernard LaCour of Columbus, Ohio, Attorney Registration No. 0032494, to replace their original counsel. Under his agreement with those plaintiffs, respondent received $18,000 as an advance against fees and expenses, and was to receive a total fee of one-third of the plaintiffs' gross recovery. In addition, the plaintiffs were each to pay an additional $300 to respondent to finance the case.

In February 1991, the district court dismissed the plaintiffs' case, finding that, even after several extensions of time, they had failed to comply with discovery orders. When the court denied the plaintiffs' motion to reconsider, respondent filed an appeal with the United States Court of Appeals for the Sixth Circuit. On July 17, 1992, the Sixth Circuit affirmed the dismissal.

The plaintiffs contend that respondent did not inform them of the dismissal when he met with them in March 1991. In fact, respondent sent a letter to the plaintiffs on July 26, 1991, stating that he had filed an appeal in the case and that he expected a "scheduling order for the submission of briefs shortly." Respondent continued to meet with representatives of the group through 1997, even hiring, in 1995, another attorney to aid in exploring possible causes of action.

In September 1997, a number of the plaintiffs, who had discovered that their case had been dismissed, confronted respondent, and he then admitted to that fact.

During the course of his employment, respondent received approximately $48,000 from his clients, $29,329.65 of which was used to pay expenses of the case. Respondent took approximately $20,000 as legal fees during his representation.

On April 5, 1999, relator, Office of Disciplinary Counsel, filed a two-count complaint alleging that the conduct of respondent violated several rules of the Code of Professional Responsibility. Respondent answered, and the matter was heard by a panel of the Board of Commissioners on Grievances and Discipline ("board"). In addition to respondent's actions and failures to act, the panel found that respondent did not cooperate with relator's efforts to investigate the complaints filed against him by the various plaintiffs.

The panel concluded that respondent's conduct violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), 1–102(A)(6) (engaging in conduct adversely reflecting on the fitness to practice law), 2–106(A) (entering into an agreement for, charging, or collecting a clearly excessive fee), 7–101(A)(2) (failing to carry out a contract entered into with a client), 7–101(A)(3) (prejudicing or damaging a client during the course of a professional relationship), and Gov.Bar R. V(4)(G) (failing to cooperate in a disciplinary investigation).

The panel heard evidence in mitigation and noted respondent's remorse, his contributions to the community during a long legal career, the fact that no prior disciplinary actions had been brought against him, and his agreement to return $20,000 in legal fees to his clients. The panel recommended that respondent be suspended from the practice of law for twenty-four months with the final eighteen months of the suspension stayed on condition that during the first six months of this suspension respondent fulfill his agreement to return the $20,000. The board adopted the findings, conclusions, and recommendation of the panel.

We adopt the findings, conclusions, and recommendation of the board. Respondent is hereby suspended from the practice of law for twenty-four months with the final eighteen months of the suspension stayed on condition that during the first six months of this suspension respondent fulfill his agreement to return the $20,000 to his clients. Failure to satisfy this condition will result in reinstatement of the stayed portion of respondent's suspension. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

LUNDBERG STRATTON, J., dissents.

LUNDBERG STRATTON, J., dissenting. I respectfully dissent and would, instead, impose a more stringent sanction in this case. Respondent's conduct and deceitfulness, and the immense harm to his many clients as a result of the dismissal of their case merits a more serious sanction.

I would suspend respondent from the practice of law for a period of twenty-four months with twelve months stayed (to which relator and respondent had originally stipulated). I would require respondent to refund the entire amount of money that he accepted from his clients, not just his fee. His neglect and inaction resulted in dismissal of his clients' claims. They should not be penalized for his failures and should at least be refunded all the monies they paid to respondent, including reimbursement for expenses incurred.

---

*Jonathan E. Coughlan,* Disciplinary Counsel, and *John K. McManus,* Assistant Disciplinary Counsel, for relator.

*Charles W. Kettlewell,* for respondent.

DAYTON BAR ASSOCIATION *v.* LONG.

[Cite as *Dayton Bar Assn. v. Long* (2001), 91 Ohio St.3d 157.]

(No. 00–1866—Submitted November 29, 2000—Decided March 14, 2001.)

*Per Curiam.* On January 5, 2000, relator, Dayton Bar Association, filed a complaint charging respondent, Michael J. Long of Dayton, Ohio, Attorney Registration No. 0039554, with violating DR 6–101(A)(3) (neglecting an entrusted legal matter) and 7–101(A)(2) (failing to carry out a contract of employment). Respondent answered, and the matter was heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

The panel found that in November 1995, Anita Miles–Coulcough paid a $500 retainer to respondent to release a garnishment against her bank account, to vacate a default judgment on which the garnishment was based, to explore the possibility of an action for wrongful garnishment, and to prepare a will for her.

Respondent filed a motion to vacate the default judgment but did not appear at a hearing on the garnishment although informed by Miles–Coulcough of the hearing date. Miles–Coulcough appeared without counsel and convinced the court that the garnishment was improper because it was levied on exempt retirement funds, a fact that Miles–Coulcough and respondent had discussed at the time of engagement.

Respondent then wrote to the creditor's counsel, sending him documentation regarding the exempt character of the property. Creditor's counsel requested additional information, but before respondent obtained that information from Miles–Coulcough, the creditor attempted a second garnishment in February 1996. Miles–Coulcough called respondent during a hearing on the second garnishment and told him that she was waiting in court for him. Respondent, who claims that he did not know of the court date, told Miles–Coulcough to ask for a continuance because he was at a real estate closing and was unable to appear. The garnishment was dismissed.

Shortly after filing the motion to vacate the default judgment, respondent wrote two letters to the judge requesting that the motion be expedited. However, the court did not set the motion for hearing until October 1999. Respondent

appeared at the hearing on the motion to vacate, but Miles–Coulcough did not appear, although respondent had written to her to inform her of the hearing. Without a witness, respondent could not proceed, and the court overruled the motion to vacate without prejudice. Respondent did not prepare a will for Miles–Coulcough. He also did not proceed on an action for wrongful garnishment, believing that it hinged on the success of the motion to vacate.

The panel concluded that respondent had violated the Disciplinary Rules as charged and found in mitigation that respondent had practiced law for forty years with no prior disciplinary actions and that he offered to return the retainer. The panel recommended that respondent be suspended from the practice of law for six months with the entire six months stayed on condition that respondent return the $500 retainer to Miles–Coulcough. The board adopted the findings, conclusions, and recommendation of the panel.

We adopt the findings, conclusions, and recommendation of the board. Respondent is hereby suspended from the practice of law for six months, with the entire six months stayed, provided that respondent return the $500 retainer to his client within one month of the date of this order. Failure to repay the full amount within six months will result in reinstatement of respondent's stayed suspension. Costs are taxed to respondent.

*Judgment accordingly.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., dissents and would suspend respondent for six months without stay.

---

*Michael R. Pentecost,* for relator.

*Michael J. Long, pro se.*

THE STATE OF OHIO, APPELLANT, *v.* EPPINGER, APPELLEE.

[Cite as *State v. Eppinger* (2001), 91 Ohio St.3d 158.]

(No. 99–788—Submitted December 12, 2000—Decided March 28, 2001.)

LUNDBERG STRATTON, J.  In 1988, Lewis Eppinger, defendant-appellee, was indicted on three counts of rape, one count of kidnapping, and one count of felonious assault.  Defendant entered a plea of not guilty to the charges, but a jury convicted him of two counts of rape in violation of R.C. 2907.02, kidnapping in violation of R.C. 2905.01, and assault in violation of R.C. 2903.13.  The trial court merged the kidnapping and one of the rape counts and sentenced defendant to two terms of incarceration of fourteen to twenty-five years on each rape count, the terms to run concurrently with each other, and to a term of incarceration of six months on the assault conviction, to run consecutively to the rape sentence. In 1990, the Court of Appeals for Cuyahoga County affirmed the trial court's judgment and sentence.

After the Ohio Department of Rehabilitation and Correction sent its recommendation, as per R.C. 2950.09(C)(1), to the trial court that defendant be adjudicated a sexual predator, the court held a sexual offender classification hearing on May 6, 1997.  At the hearing, the trial court noted that defendant had filed a motion for psychological/psychiatric expert, a motion to have the Rules of Evidence applied to the hearing, and a motion to dismiss the proceedings on constitutional grounds.

The trial court denied all three motions.  In denying the motion for appointment of a psychological/psychiatric expert, the court noted, "the Court denies that motion and finds that neither expert is competent to predict the future conduct of the individual and will take the testimony of a gypsy over those people in attempting to predict the future conduct of an individual.

"Therefore, I'm not going to permit the expenditure of state funds."

At the hearing, after informing the court that there had been no presentence report, the prosecutor recited the facts of the underlying case and information regarding defendant's convictions for aggravated robbery and felonious assault predating the rape.  After hearing the facts, the trial court stated, "I wonder if I

wasn't the Judge who presided at that trial." The state acknowledged that the trial judge had, in fact, presided at defendant's rape trial.

Defense counsel stated that he was being denied the opportunity to cross-examine or confront witnesses due to the state's mere recitation of the facts and the denial of the motion for appointment of an expert. After a hearing that is recorded in seven and one-half pages of transcript, the trial court concluded, "I had an opportunity to preside over the trial of this matter, and to my mind and recollection it was, again, rape, which I consider to be a heinous form of rape. It was violence over a period of time.

"Taken in conjunction with the defendant's background and history, I am going to find that he is a sexual predator."

The Court of Appeals for Cuyahoga County affirmed the trial court's judgment in part, reversed it in part, and remanded the cause to the trial court for further consideration of all parts of the record available to the court, "including the trial transcript and decision rendered upon direct appeal." The court further instructed the trial court "to conduct [defendant's] adjudication hearing as contemplated by the legislature and codified in the statute which includes appellant's right to present and cross-examine evidence and present witnesses on his own behalf."

The cause is now before this court upon the allowance of a discretionary appeal.

This case presents us with two more questions regarding R.C. Chapter 2950, Ohio's version of "Megan's Law." First, we must determine whether R.C. 2950.09(B)(1) requires the trial court to appoint, at the state's expense, an expert witness to testify at a sexual offender classification hearing on behalf of an indigent defendant. Second, we must decide whether the trial court properly adjudicated defendant a sexual predator based on the statutory criteria contained in R.C. 2950.09(B)(2). For the reasons that follow, we affirm in part and modify in part the judgment of the court of appeals.

The very first Megan's Law, N.J. Stat.Ann. 2C:7-1 *et seq.*, was enacted in 1994 in New Jersey in response to the rape and murder of seven-year-old Megan Kanka. *State v. Cook* (1998), 83 Ohio St.3d 404, 405–406, 700 N.E.2d 570, 573. Today, all fifty states have enacted sex offender registration laws of varying types. *Id.* at 406, 700 N.E.2d at 574. In addition, in 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Section 14071, Title 42, U.S.Code. *Id.* Although Ohio's version, R.C. Chapter 2950, does not differentiate between crimes against children and crimes against adults, recidivism among pedophile offenders is highest. Some studies have estimated the rate of recidivism as being as high as fifty-two percent for rapists and seventy-two percent for child molesters. Comparet–Cassani, A Primer on the Civil Trial of a Sexually Violent Predator (2000), 37 San Diego

L.Rev. 1057, 1071, citing Prentky, Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis (1997), 21 Law & Human Behavior 635, 651.

### Calling and Examining Witnesses and Expert Witnesses

In setting forth the procedural requirements for sexual offender classification hearings, R.C. 2950.09(B)(1) provides:

"At the hearing, the offender and the prosecutor shall have an opportunity to testify, present evidence, call and examine witnesses and expert witnesses, and cross-examine witnesses and expert witnesses regarding the determination as to whether the offender is a sexual predator. The offender shall have the right to be represented by counsel and, if indigent, the right to have counsel appointed to represent the offender."

The court of appeals concluded that the trial court's denial of this indigent defendant's request for appointment of an expert psychologist or psychiatrist to evaluate him prior to the hearing effectively precluded defendant from presenting evidence on his own behalf on the issue of whether he is "likely to engage in the future in one or more sexually oriented offenses." The court of appeals held that the statute was clear and unambiguous in its provision *mandating* that the offender shall have the opportunity to testify, present evidence, and call, examine, and cross-examine witnesses, including expert witnesses. Further, the court concluded that the trial court's denial was so prejudicial that it amounted to plain error. We agree, in part.

R.C. Chapter 2950 defines three classifications of sex offenders: sexual predators, habitual sexual offenders, and sexually oriented offenders. R.C. 2950.09; *Cook*, 83 Ohio St.3d at 407, 700 N.E.2d at 574. To earn the most severe designation of sexual predator, the defendant must have been convicted of or pled guilty to committing a sexually oriented offense and must be "likely to engage in the future in one or more sexually oriented offenses." R.C. 2950.01(E).

Once a person is designated a sexual predator, R.C. Chapter 2950 places certain obligations on the offender. Sexual predators must register with their county sheriff and provide a current home address, the name and address of the offender's employer, a photograph, and any other information required by the Bureau of Criminal Identification and Investigation. R.C. 2950.04(C). In addition, sexual predators must provide the license plate number of each motor vehicle owned by the offender or registered in the offender's name. R.C. 2950.04(C)(2). Sexual predators must verify their current home address every ninety days for life. R.C. 2950.06(B)(1). Moreover, the sheriff with whom the offender has most recently registered must notify particular community members of the offender's status as a sexual predator and of his current address, if the trial court imposes that requirement. R.C. 2950.10 and 2950.11.

This court has already recognized that these requirements have grave consequences. "At a sexual offender classification hearing, decisions are made regarding classification, registration, and notification that will have a profound impact on a defendant's life." *State v. Gowdy* (2000), 88 Ohio St.3d 387, 398, 727 N.E.2d 579, 589.

We noted in *Gowdy* the danger of making the sexual offender classification hearing perfunctory in nature, which would deny defendant the rights guaranteed him under the statute. *Id.* at 398, 727 N.E.2d at 589. So, too, would denying an indigent defendant, under these circumstances, the "opportunity to testify, present evidence, call and examine witnesses and expert witnesses, and cross-examine witnesses and expert witnesses regarding the determination as to whether the offender is a sexual predator." R.C. 2950.09(B)(1).

In some instances, offenders will have several sexually oriented convictions, or will clearly fit a variety of the factors listed in R.C. 2950.09(B)(2)(a) through (j). An offender who preys on children, for example, may fit the pedophile profile, a class of sex offenders known for their especially high rate of recidivism. There may be sufficient evidence in the transcripts, victim impact statements, presentence investigation reports, prior history of arrests and convictions, age, etc., presented at the sexual offender classification hearing with respect to the R.C. 2950.09(B)(2) factors as they relate to the likelihood of reoffending. In those situations, appointment of an expert for an indigent offender may be unwarranted. But a person who has been convicted of or who has pled guilty to committing *one* sexually oriented offense is not necessarily likely to engage in the future in one or more sexually oriented offenses. One sexually oriented offense is not a clear predictor of whether that person is likely to engage in the future in one or more sexually oriented offenses, particularly if the offender is not a pedophile. Thus, we recognize that one sexually oriented conviction, without more, may not predict future behavior. Therefore, the appointment of an expert may be warranted to aid the trial court in determining the likelihood of recidivism.

We disagree with the court of appeals that such an appointment is mandatory. Instead, we hold that an expert witness shall be provided to an indigent defendant at an R.C. 2950.09(B)(1) sexual offender classification hearing if the court determines, within its sound discretion, that such services are reasonably necessary to determine whether the offender is likely to engage in the future in one or more sexually oriented offenses within the meaning of R.C. 2950.01(E). Compare *State v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192, syllabus (trial court in capital sentencing phase must provide mental health expert for indigent defendant only if court determines, in its discretion, that expert is "reasonably necessary").

Here, the transcript of the sexual offender classification hearing reveals that the trial court denied the motion for appointment of an expert, stating that the court would "take the testimony of a gypsy over those people [psychological/psychiatric expert] in attempting to predict the future conduct of an individual." The court's reasons for denial appear to be grounded more in personal disdain for such expert testimony rather than on any legal basis. Admittedly, predicting future behavior of a sex offender, or anyone else, for that matter, is an imperfect science. Nonetheless, R.C. Chapter 2950 requires it, and the evidence presented by a psychologist, psychiatrist, or other expert in the field of predicting future behavior may be the best tool available to the court to assist it in making these determinations.

Because "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense * * * when those tools are available for a price to other prisoners," *Britt v. North Carolina* (1971), 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400, 403, it follows that the defendant would also be entitled to an expert provided at state expense in order to avail himself or herself of the statutory right to present witnesses on his or her own behalf. Further, cross-examination and nonexpert witness testimony are not always helpful to the indigent defendant when the central issue involves predicting future behavior—something only an expert can do, absent a history of similar offenses or other indicators.

Because this defendant had been convicted of only one sexually oriented offense, a psychiatric or psychological expert or other expert in the science of predicting human sexual behavior was reasonably necessary to aid in determining whether the defendant is likely to engage in one or more sexually oriented offenses in the future. Accordingly, we affirm the court of appeals' decision to instruct the trial court on remand to reconsider defendant's sexual offender classification by holding a new hearing, giving the defendant the opportunity to present and cross-examine witnesses and present evidence on his own behalf, including an expert witness, as requested by the defendant, and by examining the actual record, etc., but modify that part of the court's holding stating that such an expert is mandatory.

### Sufficiency of the Evidence

As previously noted, at the sexual offender classification hearing, in order for the offender to be designated a sexual predator, the state must prove by clear and convincing evidence that the offender has been convicted of a sexually oriented offense *and* that the offender is likely to engage in the future in one or more sexually oriented offenses. R.C. 2950.01(E) and 2950.09(B)(3).

The General Assembly supplied the trial court with several factors to consider in making this weighty decision. R.C. 2950.09(B)(2) provides:

"In making a determination * * * as to whether an offender is a sexual predator, the judge shall consider all relevant factors, including, but not limited to, all of the following:

"(a) The offender's age;

"(b) The offender's prior criminal record regarding all offenses, including, but not limited to, all sexual offenses;

"(c) The age of the victim of the sexually oriented offense for which sentence is to be imposed;

"(d) Whether the sexually oriented offense for which sentence is to be imposed involved multiple victims;

"(e) Whether the offender used drugs or alcohol to impair the victim of the sexually oriented offense or to prevent the victim from resisting;

"(f) If the offender previously has been convicted of or pleaded guilty to any criminal offense, whether the offender completed any sentence imposed for the prior offense and, if the prior offense was a sex offense or a sexually oriented offense, whether the offender participated in available programs for sexual offenders;

"(g) Any mental illness or mental disability of the offender;

"(h) The nature of the offender's sexual conduct, sexual contact, or interaction in a sexual context with the victim of the sexually oriented offense and whether the sexual conduct, sexual contact, or interaction in a sexual context was part of a demonstrated pattern of abuse;

"(i) Whether the offender, during the commission of the sexually oriented offense for which sentence is to be imposed, displayed cruelty or made one or more threats of cruelty;

"(j) Any additional behavioral characteristics that contribute to the offender's conduct."

As noted by the court of appeals, "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 364, 120 N.E.2d 118, 123.

The court of appeals observed that eight of the statutory factors involve what may be considered "old conviction data," which may be found in the court's file. Yet, at defendant's hearing, the state simply recited into the record its own recollection of the facts of the underlying offense from the trial, which had

occurred eight years earlier. The trial court did not review the trial transcript. The trial court did not review the opinion of the court of appeals on direct appeal. The trial court did not review any presentence investigation reports, nor did it review the defendant's criminal record. The trial court did not review *any* documentary evidence, nor did it hear from *any* witnesses on *either* side. The trial court even had to seek clarification on whether it had heard the underlying case.

In fact, the trial court simply stated, "I had an opportunity to preside over the trial of this matter, and to my mind and recollection it was, again, rape, which I consider to be a heinous form of rape. It was violence over a period of time.

"Taken in conjunction with the defendant's background and history, I am going to find that he is a sexual predator." Further, the entry of the trial court reflects that "[d]efendant is found to be a sexual predator in light of the nature of the underlying sexual offense for which the defendant had been convicted."

In reversing the defendant's designation as a sexual predator, the court of appeals concluded that "[defendant's] prior convictions do not include sexually oriented offenses; the single victim in this case was an adult; the underlying sexual offense took place more than ten years ago; there is no evidence shown to indicate that [defendant] used drugs or alcohol to impair the victim; there was no demonstration of a pattern of abuse; and there was no evidence presented to show behavioral characteristics of [defendant] contributing to his conduct or to indicate a mental illness or disability." We agree.

We find that the trial court abused its discretion in denying the defendant's request for an expert witness and in essentially adjudicating defendant a sexual predator on the basis of one factor (nature of the sexual conduct). Moreover, the trial court's "recollection" that defendant's crime was "heinous" was simply insufficient to show that defendant was likely to commit another sexually oriented offense.

Although certainly even one sexually oriented offense is reprehensible and does great damage to the life of the victim, R.C. Chapter 2950 is not meant to punish a defendant, but instead, "to protect the safety and general welfare of the people of this state." R.C. 2950.02(B). Thus, if we were to adjudicate all sexual offenders as sexual predators, we run the risk of "being flooded with a number of persons who may or may not deserve to be classified as high-risk individuals, with the consequence of diluting both the purpose behind and the credibility of the law. This result could be tragic for many." *State v. Thompson* (Apr. 1, 1999), Cuyahoga App. No. 73492, unreported, 1998 WL 1032183. Moreover, the legislature would never have provided for a hearing if it intended for one conviction to be sufficient for an offender to be labeled a "sexual predator."

Instead of deciding whether the offender is particularly deserving of punishment, the issue presented to the court at a sexual offender classification hearing is whether the defendant is likely to commit future sexually oriented offenses. Not only is this determination problematic for the trial court to make, but it is certainly confounding to review on appeal without an adequate record. Accordingly, we believe that trial courts, prosecutors, and defense attorneys should adhere to some basic standards to meet the criteria required in an R.C. 2950.09 hearing. We adopt the following model procedure for sexual offender classification hearings, based on a model set forth by the Cuyahoga County Court of Appeals in *State v. Thompson, supra.*

In a model sexual offender classification hearing, there are essentially three objectives. First, it is critical that a record be created for review. Therefore, the prosecutor and defense counsel should identify on the record those portions of the trial transcript, victim impact statements, presentence report, and other pertinent aspects of the defendant's criminal and social history that both relate to the factors set forth in R.C. 2950.09(B)(2) and are probative of the issue of whether the offender is likely to engage in the future in one or more sexually oriented offenses. If the conviction is old, as in this case, the state may need to introduce a portion of the actual trial record; if the case was recently tried, the same trial court may not need to actually review the record. In either case, a clear and accurate record of what evidence or testimony was considered should be preserved, including any exhibits, for purposes of any potential appeal.

Second, an expert may be required, as discussed above, to assist the trial court in determining whether the offender is likely to engage in the future in one or more sexually oriented offenses. Therefore, either side should be allowed to present expert opinion by testimony or written report to assist the trial court in its determination, especially when there is little information available beyond the conviction itself. While providing an expert at state expense is within the discretion of the trial court, the lack of other criteria to assist in predicting the future behavior of the offender weighs heavily in favor of granting such a request.

Finally, the trial court should consider the statutory factors listed in R.C. 2950.09(B)(2), and should discuss on the record the particular evidence and factors upon which it relies in making its determination regarding the likelihood of recidivism. See *State v. Thompson, supra.* See, also, *State v. Russell* (Apr. 8, 1999), Cuyahoga App. No. 73237, unreported, 1999 WL 195657; *State v. Casper* (June 10, 1999), Cuyahoga App. Nos. 73061, 73064, 73062 and 73063, unreported, 1999 WL 380437.

We are cognizant of our statement in *State v. Cook, supra,* that R.C. 2950.09 does not require the court to list all criteria, but only to consider all relevant factors in making its findings. *Id.,* 83 Ohio St.3d at 426, 700 N.E.2d at 587.

However, we also noted in *Cook* that the sexual offender classification hearing in that case was not a model hearing. *Id.* at 425, 700 N.E.2d at 587. Therefore, we are suggesting standards for the trial courts that will aid the appellate courts in reviewing the evidence on appeal and ensure a fair and complete hearing for the offender.

As we observed above, under certain circumstances, it is possible that one sexually oriented conviction alone can support a sexual predator adjudication. However, the scant "evidence" presented at this sexual offender classification hearing fell short of establishing by clear and convincing evidence that the defendant was likely to engage in one or more sexually oriented offenses in the future.

Accordingly, we affirm that portion of the court of appeals' judgment that directed the trial court on remand to consider "all parts of the record available to the court," including the trial transcript and decision rendered upon direct appeal. We further order the trial court to grant defendant's motion for appointment of an expert witness at state expense.

*Judgment affirmed as modified.*

F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., concurs except that he joins Part I of COOK, J.'s opinion concurring in part and dissenting in part.

DOUGLAS and RESNICK, JJ., concur in syllabus and judgment.

COOK, J., concurs in part and dissents in part.

---

**COOK, J., concurring in part and dissenting in part.** For the following reasons, though I join the majority's syllabus and would also affirm the judgment of the court of appeals as modified, I would not modify the court of appeals' judgment in the same manner as the majority and respectfully decline to join the majority's opinion.

I

The majority states that "[a]lthough * * * R.C. Chapter 2950 does not differentiate between crimes against children and crimes against adults, recidivism among pedophile offenders is highest." This factual assertion, supported by citation to a San Diego Law Review article, is unnecessary to the resolution of the legal issues presented in this case. It is exactly the type of factual assertion that an expert might be called upon to make at a classification hearing should a trial court, in its discretion, determine that the services of an expert are reasonably

necessary to assist the court in resolving the recidivism issue. Having decided that trial courts must, when reasonably necessary, appoint experts for indigent offenders at state expense, this court need not and should not lend its imprimatur to particular factual assertions that such experts may or may not make. It is for similar reasons that I respectfully disagree with the majority's assertion that "[o]ne sexually oriented offense is not a clear predictor of whether that person is likely to engage in the future in one or more sexually oriented offenses, particularly if the offender is not a pedophile. Thus, we recognize that one sexually oriented conviction, without more, may not predict future behavior."

## II

The majority concludes that "[b]ecause this defendant had been convicted of only one sexually oriented offense, a psychiatric or psychological expert or other expert * * * was reasonably necessary to aid in determining whether the defendant is likely to engage in one or more sexually oriented offenses in the future." Accordingly, the majority remands the cause, instructing the trial court on remand to *grant* Eppinger's request for an expert. Though I agree that the trial court abused its discretion when it arbitrarily denied Eppinger's request on the basis of a personal bias against such experts (comparing them to "gypsies"), I would remand the cause to the trial court with instructions to apply the standard announced in today's syllabus. That is, the trial court should be given the opportunity to properly exercise its discretion by applying today's standard in order to determine whether expert assistance is reasonably necessary in this case. The exercise of sound discretion may lead the trial court to decide that an expert is necessary. But that is the trial court's decision to make in the first instance, not ours.

## III

---

*William D. Mason*, Cuyahoga County Prosecuting Attorney, and *Michael D. Horn*, Assistant Prosecuting Attorney, for appellant.

*David H. Bodiker*, State Public Defender, and *Christa M. Hohmann*, Assistant State Public Defender, for appellee.